# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---------------------------------------------------------

MELISSA GORDON, Individually and on      :
Behalf of All Others Similarly Situated,      :
     :    Civil Action No. 16-cv-1153
        Plaintiff,      :
     :
v.      :    **CLASS ACTION COMPLAINT FOR**
     :    **VIOLATIONS OF SECTIONS 14(a)**
JOY GLOBAL INC., EDWARD L. DOHENY      :    **AND 20(a) OF THE SECURITIES**
II, STEVEN L. GERARD, MARK J. GLIEBE,      :    **EXCHANGE ACT OF 1934**
JOHN T. GREMP, JOHN NILS HANSON,      :
GALE E. KLAPPA, RICHARD B. LOYND, P.      :    **JURY TRIAL DEMAND**
ERIC SIEGERT, and JAMES H. TATE,      :
     :
        Defendants.      :

---------------------------------------------------------

## CLASS ACTION COMPLAINT

Melissa Gordon ("Plaintiff"), on behalf of herself and all others similarly situated, by and through her attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

1.     This is a class action brought by Plaintiff on behalf of herself and the other public shareholders of Joy Global Inc. ("Joy" or the "Company"), other than Defendants and their affiliates, against Joy and the members of its board of directors (the "Board" or the "Individual Defendants," and together with Joy, the "Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger between Joy and Komatsu America Corp. ("Komatsu"), the U.S.-based subsidiary of the Japanese multinational corporation Komatsu Ltd. (the "Proposed Merger").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading proxy statement (the "Proxy") to be filed with the SEC. The Proxy recommends that Joy shareholders vote in favor of the Proposed Merger, whereby Joy will merge with Pine Solutions, Inc., a wholly owned subsidiary of Komatsu, and will thereafter continue as the surviving corporation. Pursuant to the terms of the definitive agreement and plan of merger these entities entered into (the "Merger Agreement"), Joy shareholders stand to receive $28.30 in cash per share (the "Merger Consideration") if the Proposed Merger is consummated.

3.     As discussed below, the Merger Consideration and the process by which Defendants propose to consummate the Proposed Merger are fundamentally unfair to Plaintiff and the other common shareholders of Joy. Indeed, a senior research analyst covering Joy at Milwaukee-based Robert W. Baird & Co. Inc. has stated that "the value of the transaction, which boils down to $28.30 (per share), effectively does not extract as much value as there should be for Joy's shareholders. In our view, something closer to $40, frankly above $40, would accomplish that."[1]

4.     Defendants have now asked Joy's shareholders to support the Proposed Merger in exchange for the inadequate Merger Consideration based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's internal financial analyses and forecasts prepared by management, presented to the Board, and utilized by the Company's financial advisor, Goldman Sachs & Co. ("Goldman Sachs") in connection with preparing its opinion that

---

[1] Molly Dill, *Joy Global could still have other bidders*, BIZTIMES MILWAUKEE BUSINESS NEWS (July 25, 2016), https://www.biztimes.com/2016/07/25/joy-global-could-still-have-other-bidders/.

the Merger Consideration is purportedly "fair, from a financial point of view" to Joy shareholders ("Fairness Opinion"); (ii) conflicts of interest Goldman Sachs faced as a result of its prior work for both Joy and Komatsu; and (iii) certain information regarding the events preceding the signing of the Merger Agreement.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Merger, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Joy's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Joy's shareholders.  In the event the Proposed Merger is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Joy maintains its primary place of business in this District; (iii) a

3

substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

9.      Plaintiff is, and has been at all relevant times, the owner of Joy common stock and has held such shares since prior to the wrongs complained of herein. She is a resident of New York County, New York.

10.      Defendant Joy is a Delaware corporation that maintains its principal executive offices in Milwaukee, Wisconsin.   The Company is a leading provider of advanced equipment, systems and direct services for the global mining industry.

11.      Individual Defendant Edward L. Doheny II ("Doheny") is the President and Chief Executive Officer of Joy. Prior to assuming these roles, he was an executive vice president for the Company as well as Chief Operating Officer of Joy's underground business segment.  He is also a member of the Joy Board.  Doheny also serves as a director of John Bean Technologies Corporation.

12.      Individual Defendant Steven L. Gerard ("Gerard") is a member of the Joy Board. Gerard also serves as Chairman of CBIZ, Inc., a leading provider of integrated business services and products headquartered in Cleveland, Ohio.  He has served as Chief Executive Officer from 2000 to 2016 and has been Chairman since 2002.   Gerard is also a director of Lennar Corporation and the Las Vegas Sands Corporation.

13.      Individual Defendant Mark J. Gliebe ("Gliebe") is a member of the Joy Board. Gliebe also serves as Chairman of the Board and Chief Executive Officer of Regal Beloit Corporation, a global manufacturer of electric motors and controls, electric generators and

controls and mechanical motion control products. Prior to joining Regal Beloit, Gliebe was employed by General Electric Company from 2000 to 2004 as the General Manager of GE Motors & Controls in the GE Consumer & Industrial business unit.

14. Individual Defendant John T. Gremp ("Gremp") is a member of the Joy Board. Gremp has also served as Chief Executive Officer of FMC Technologies, Inc., a major manufacturer of oilfield equipment since March 2011 and as Chairman since November 2011. Gremp has also served as a director of FMC Technologies, Inc. since 2011.

15. Individual Defendant John Nils Hanson ("Hanson") has served as Chairman of the Joy Board since 2000. He previously served as President and Chief Executive Officer of the Company from 1999 to 2006. Hanson has also served as a director of Arrow Electronics, Inc. since 1998.

16. Individual Defendant Gale E. Klappa ("Klappa") is a member of the Joy Board. Klappa also serves as Chairman of WEC Energy Group, Inc., a Milwaukee-based holding company with subsidiaries in utility and non-utility businesses since 2004. Prior to joining WEC Energy, Klappa was Executive Vice President, Chief Financial Officer and Treasurer of The Southern Company. Klappa also serves as a director of Badger Meter, Inc. and Associated Banc-Corp.

17. Individual Defendant Richard B. Loynd ("Loynd") is a member of the Joy Board. Loynd is also President of Loynd Capital Management. He previously served as Chairman and/or Chief Executive Officer, or as a director, of a number of public companies doing business in the industrial and consumer product areas.

5

18.     Individual Defendant P. Eric Siegert ("Siegert") is a member of the Joy Board. Siegert also works as a **Senior Managing Director of Houlihan Lokey Howard & Zukin, an** international investment banking firm.

19.     Individual Defendant James H. Tate ("Tate") is a member of the Joy Board. Tate also serves as an independent consultant to the Company. From 2005 to 2006, he was Executive Vice President, Chief Administrative Officer, and Chief Financial Officer of TIMCO Aviation Services, Inc. Tate previously served as the Senior Vice President and Chief Financial Officer of Thermadyne Holdings Corporation from 1995 to 2004. Tate also served as Joy's acting Chief Financial Officer from March 4, 2008 to December 9, 2008. Tate also previously worked as an accountant at Ernst & Young, LLP.

**SUBSTANTIVE ALLEGATIONS**

**The Proposed Merger Undervalues Joy**

20.     Joy manufactures and services mining equipment for extraction of coal, copper, iron ore, oil sands, gold, and other minerals and ores worldwide. It operates in two segments: Underground Mining Machinery and Surface Mining Equipment. The Underground Mining Machinery segment produces armored face conveyors, battery haulers, continuous chain haulage systems, continuous miners, conveyor systems, feeder breakers, flexible conveyor trains, hard rock mining products, high angle conveyors, longwall shearers, powered roof supports, road headers, roof bolters, and shuttle cars. This segment also provides equipment assemblies, service, repairs, rebuilds, parts, consumables, enhancement kits, and training. The Surface Mining Equipment segment produces blasthole drills, conveyor systems, electric mining shovels, hybrid excavators, feeder breakers, high angle conveyors, walking draglines, and wheel loaders. This segment also provides equipment assemblies, relocations, inspections, service, repairs, rebuilds, upgrades, used equipment, parts, consumables, enhancement kits, and training. The

Company also offers life cycle management support services and project management services, as well as smart services, including equipment monitoring, predictive diagnostics, service training support, and parts management for underground and surface applications. The Company sells its products and services directly to mining companies through a network of sales and marketing personnel. Joy was founded in 1884 and is headquartered in Milwaukee, Wisconsin.

21. The Merger Consideration fails to adequately compensate Joy shareholders in light of the Company's recent and historical financial performance and strong growth prospects.

22. Joy's stock traded above the Merger Consideration within the 52-week period prior to the announcement of the Proposed Merger. Thus, the Merger Consideration actually represents a *discount* of 2% compared to Joy's 52-week intraday high market price of $28.99 per share for the period ended on July 20, 2016. The Company's stock price closed at *$44.22* per share as recently as May 2015, nearly $16.00, or 56 percent, higher than the Merger Consideration.

23. Although the Company's stock price dropped between May 2015 and January 2016 in light of concerns about the financial prospects of the coal mining industry, the drop was largely the result of panicky investors rather than a reflection of the Company's future prospects or inherent value. Indeed, after bottoming-out in January, Joy's stock price increased by approximately 164% as of the date prior to the announcement of the Proposed Merger.

24. Analysts have noted that Joy ran itself well through the recent downturn in the coal mining industry. The Company's free cash flow stayed positive, and it was able to expand into new lines of business, including expanding its hard rock mining capabilities and targeting India as a growth market.

25. The Company's strong growth prospects were also reflected in its most recent financial results. On June 2, 2016, Joy issued a press release announcing its financial performance for the second quarter of 2016. The Company drastically exceeded Wall Street's estimates, announcing adjusted earnings of 9 cents per share, well above Wall Street's forecast for a 3-cent loss.

26. The positive financial results caused the Company's stock price to surge by 23%. Analysts also increased their price targets for the Company, with one firm raising its target to $30.00 per share. Nevertheless, in an effort to downplay the significance of the Company's second quarter results and persuade shareholders to support the deal, the Proxy suggests that the increase in Joys' stock price between early June and mid-July was the result of an "unexplained increase" Proxy at 32. Joy's stock price increase during this period was not "unexplained"; rather, as Fox Business noted in an article published on July 6, Joy shares "jumped 24.1% in June after earnings results topped expectations."[2]

27. As a result of Joy's ability to successfully weather a difficult market that industry observers believe has bottomed out and will now begin to rebound, the Company's recent financial success and significant stock price increase, and promising prospects in foreign markets, analysts believe that the Merger Consideration grossly undervalues the Company. As noted above, Robert W. Baird & Co. Inc. has stated that "the value of the transaction, which boils down to $28.30 (per share), effectively does not extract as much value as there should be

---

[2] *Why Shares of Joy Global Inc. Popped 24% in June*, FOX BUSINESS (July 6, 2016), http://www.foxbusiness.com/markets/2016/07/06/why-shares-joy-global-inc-popped-24-in-june.print.html.

for Joy's shareholders. In our view, something closer to $40, frankly above $40, would accomplish that."[3]

28.     In sum, Joy is well-positioned to generate significant earnings in the foreseeable future, particularly in light of its strong position within a rebounding market. Despite Joy's bright financial prospects, the Board has now agreed to sell the Company at a time when its stock price does not accurately reflect the Company's intrinsic value and growth prospects, to the detriment of Joy's common shareholders.

**The Single Bidder Sale Process Failed to Maximize Shareholder Value**

29.     As described in the Proxy, the inadequate Merger Consideration is the result of a flawed sale process during which the Board engaged solely with representatives of Komatsu, and declined to reach out to a single other interested party.

30.     Goldman Sachs presented the Board with a list of "potential strategic partners" as early as March 7, 2016. Proxy at 26. And on June 6, 2016, Goldman Sachs once again presented the Board with a "specific list of companies" that it believed might be interested in and financially capable of acquiring Joy for a price at least equal to Komatsu's $28.00 offer. Proxy at 29. Nevertheless, the Joy Board declined to reach out to *any* of the parties identified by Goldman Sachs, after the Board purportedly and inexplicably concluded that "Komatsu was the best buyer for Joy Global and that it was not likely that any other potential party would be willing and capable of acquiring Joy Global at a price equal to or great than Komatsu." Proxy at 29. The Proxy fails to provide any basis whatsoever for the Board's conclusion, which is contrary to observations by industry observers. Indeed, observers have suggested that Volvo, Atlas Copco, GE, Liebherr Group, Hitachi Construction Machinery Co. Ltd., and certain other

---

[3] Molly Dill, *Joy Global could still have other bidders*, BIZTIMES MILWAUKEE BUSINESS NEWS (July 25, 2016), https://www.biztimes.com/2016/07/25/joy-global-could-still-have-other-bidders/.

competitors in China would have been interested in acquiring Joy, had the Board bothered to reach out to them prior to the signing of the Merger Agreement. As a result of the $75 million termination fee and other deal protection provisions in the Merger Agreement, however, these companies and any other interested bidders now face significant impediments to submitting a superior offer.

31.     The Board, led by Joy CEO Mr. Doheny and other members of Joy senior management, was content to finalize a deal with Komatsu at the inadequate offer price rather than reaching out to other interested parties. Komatsu was Joy management's and the Board's preferred suitor, as the key players at each company are familiar with one another as a result of Komatsu's previous interest in acquiring Joy. Specifically, Komatsu acknowledged that it was interested in acquiring Joy back in 2012, but it ultimately elected not to move forward with a deal at that time.

32.     Further, the Board and Joy management pushed Komatsu to commit to matters relating to post-close employee retention and compensation *prior* to the signing of the Merger Agreement, despite the fact that Komatsu was reluctant to do so. As a result, each of Joy's executive officers, including Mr. Doheny, have entered into change in control agreements providing for their continued employment for a period of three years following a change in control of the Company. Komatsu has further indicated that it intends to keep on Joy's senior executives after the completion of the Proposed Merger, allowing them to keep their lucrative positions with the Company.

33.     Additionally, each of the eight non-employee director Individual Defendants will receive lucrative payouts as a result of the accelerated vesting of their restricted share unit awards and company performance share awards, in the aggregate amount of $1,236,144.

However, the Proxy fails to disclose the precise total amount of consideration each Individual Defendant will receive if the Proposed Merger is consummated, as the table entitled "Security Ownership of Certain Beneficial Owners and Management" on page 79 of the Proxy only provides the amount of shares each Individual Defendant beneficially owns, but does not disclose how many shares are restricted units.

34.     As a result of the unique personal financial benefits each of the Individual Defendants will reap if the Proposed Merger is consummated, they were each motivated to support the transaction despite the fact that it fails to adequately compensate Joy's public shareholders.  In addition to declining to reach out to a single other interested party, the Board's negotiations with respect to Komatsu's offer price were cursory.

35.     Specifically, after Komatsu made a few patently unreasonable offers to acquire the Company, on June 7, 2016 the Board responded with a specific counterproposal of precisely $28.00 per share.  Rather than negotiating like a rational actor interested in maximizing shareholder value and providing Komatsu with a counterproposal *range* that exceeded what the Board hoped to obtain but could have been used as a negotiation chip to increase Komatsu's overall bid, the Board countered with what was clearly an inadequate price for Joy shareholders.  Tellingly, a mere five days later, with no further negotiation, Komatsu pounced on the opportunity to wrap the deal up for $28.00 per share, as they recognized they were getting a steal at that price.

36.     A few weeks later, the Board recognized that its $28.00 per share counterproposal failed to provide Joy shareholders with adequate consideration.  But by that point in time, the Board had already severely hampered its negotiating position, as Komatsu was unwilling to let the Board wiggle out of the tentative agreement on price the parties had reached.  Ultimately, the

Board obtained a measly thirty cents increase, as Komatsu agreed to increase its offer to $28.30 per share, or 1%. Nevertheless, the Board accepted Komatsu's inadequate revised offer.

37.     The Board knew that because it had instructed Goldman Sachs to utilize the pessimistic forecasts rather than the optimistic forecasts Joy management had previously prepared, Goldman Sachs would be able to rubber stamp Komatsu's inadequate offer with a "fairness opinion".

38.     In sum, the inadequate sale process was tainted by personal financial benefits which are unique to the Individual Defendants and not shared by Joy's public shareholders. It is therefore imperative that Joy's shareholders receive the material information referenced below, so that the can cast a fully informed vote on the Proposed Merger.

**The Preclusive Deal Protection Provisions**

39.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Joy.

40.     First, the Merger Agreement contains an onerous no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Joy shareholders. Specifically, section 5.02 of the Merger Agreement states that the Company and the Individual Defendants shall not:

   i)      directly or indirectly solicit, initiate or knowingly encourage, induce or facilitate any Company Takeover Proposal or any inquiry or proposal that would reasonably be expected to lead to a Company Takeover Proposal; or

   ii)     directly or indirectly participate in any discussions or negotiations with any Person (except for with Parent and Parent's Affiliates and their respective Representatives) regarding, or furnish to any such Person, any nonpublic information with respect to, or cooperate in any way with any such Person with respect to, any Company Takeover Proposal or any inquiry or proposal that would reasonably be expected to lead to a Company Takeover Proposal.

12

41.     Additionally, Section 5.02 of the Merger Agreement grants Komatsu recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three business days to negotiate with Joy, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

42.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Komatsu can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Komatsu, to the detriment of Joy's public shareholders.

43.     Lastly, section 8.02 of the Merger Agreement provides that Joy must pay Komatsu a termination fee of $75 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Joy shareholders with a superior offer.

44.     Ultimately, these preclusive deal protection provisions restrain Joy's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

45.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Joy's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

**The Materially Incomplete and Misleading Proxy**

46.     On August 15, 2016 Defendants caused the Proxy to be filed with the SEC, and the Proxy has been published on the SEC's online Edgar database.  The information contained in the Proxy has thus been disseminated to Joy shareholders to solicit their vote in favor of the

13

Proposed Merger. The Proxy omits certain material information concerning the fairness of the Proposed Merger and Merger Consideration. Without such information, Joy shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Merger.

### *Joy's Financial Forecasts*

47.     First, the Proxy indicates that on March 7, 2016, *after* the Joy Board and management had already commenced negotiations with Komatsu, members of senior management presented the Board with two different sets of "financial cases"/financial forecasts. The first case "reflected a slow recovery in the coal mining industry and Joy Global's businesses potentially reaching the low point of the cycle in 2017" (the "Pessimistic Forecast"). In particular, the Pessimistic Forecast "assumed that the prices for the commodities that impact Joy Global's businesses would decline substantially in 2016 before slowly recovering from 2017 through 2021, and sales in the hard rock and industrial market would grow at a significantly stronger rate over that period." Joy's senior management also presented the Board with a second case of projections that reflected a more robust recovery in the coal mining industry, (the "Optimistic Forecast"). Specifically, the Optimistic Forecast "assumed that the prices for the commodities that impact Joy Global's businesses would decline much less significantly in 2016, with a slightly stronger recovery than in the first scenario from 2017 through 2021, and that as compared to the first scenario the sales growth over that period would be slightly higher in the hard rock and industrial market but significantly stronger in service products." Proxy at 27.

48.     The Board directed management to revise the two "financial cases" it presented to the Board on March 7, 2016, and purportedly instructed management to "prepare a robust 'bottom's up' financial analysis that would reflect further thinking about market conditions" for

Goldman Sachs to use in the financial analyses it would use to support its Fairness Opinion. Proxy at 27.

49.     On June 6, 2016, three months after the Board initially instructed Joy management to revise its "financial cases" and prepare a "bottom's up" financial analysis, and three weeks after Komatsu made a revised offer to acquire Joy at a price of $24.50 per share, management told the Board that it had prepared an "analysis" that was "directionally closer to the scenario involving a *slow recovery* in the coal mining industry and Joy Global's businesses that had been presented at the March 8 meeting of the board," *i.e.* that closely resembled the Pessimistic Forecast (the "June 6 Analysis"). Proxy at 28. Goldman utilized the June 6 Analysis, which largely mirrored or incorporated the Pessimistic Forecast, in connection with preparing a financial analyses of Komatsu's $24.50 offer.

50.     The Proxy fails to specify exactly which forecast(s) Goldman Sachs utilized in connection with its Fairness Opinion. Instead, the Proxy vaguely and misleadingly states that Goldman relied upon and utilized "certain internal financial analyses and forecasts for Joy Global prepared by its management, as approved by Joy Global for use by Goldman Sachs," which are defined in the Proxy as the "Joy Global Forecasts". Proxy at 38, 41, 43, 45. Presumably, the "Joy Global Forecasts" referred to in the Proxy are the same or similar to the Pessimistic Forecast that Joy management presented to the Board on March 8, 2016, which were subsequently used to prepare the June 6 Analysis. However, the Proxy must specify precisely which forecast(s) Goldman Sachs utilized in connection with its Fairness Opinion, and when such forecasts were prepared by Joy management. The omission of this information renders the vague definition of the Joy Global Forecasts misleading.

51.     The Proxy is also materially incomplete and misleading because it only provides a summary of the "Joy Global Forecasts" which, based upon the description in the Proxy, Plaintiff presumes are the same as or closely resemble the Pessimistic Forecast.  The Proxy must provide a fair summary of the Optimistic Forecast, *i.e.* the "financial case[] for the future performance of the business representing Joy Global's standalone plans" under the "second scenario" as referred to on page 26 of the Proxy.  By selectively disclosing only the projections mirroring or closely resembling the Pessimistic Forecast, Defendants have provided Joy shareholders with a materially incomplete and misleading view of the Company's future standalone prospects.  The omission of the Optimistic Forecast from the Proxy renders the "Joy Global Forecasts" on page 46 of the Proxy misleading, as those projections only present shareholders with a pessimistic view of the Company's future performance, despite the fact that management prepared and the Board was presented with a much more optimistic "case" that supports a higher valuation of the Company.

52.     Further, the "Summary of the Joy Global Forecasts" on page 46 of the Proxy provides line item projections for certain non-GAAP (generally accepted accounting principles) measures without providing sufficient information concerning the various adjustments that were made to each measure.

53.     Specifically, the Proxy contains projections for Adjusted EBITDA, Unlevered Free Cash Flow, and Adjusted EPS.  The Proxy notes that the Adjusted EBITDA projections were "adjusted to exclude excess purchase accounting, restructuring costs, mark to market pension and other pension items, impairment charges, acquisition costs and other non-recurring items"; that the Unlevered Free Cash Flow projections were prepared by taking the Adjusted EBITDA projections "minus capital expenditures, plus or minus the decrease or increase in

working capital, minus income taxes"; and that the Adjusted EPS projections were "adjusted to exclude excess purchase accounting, restructuring and related costs, mark to market pension and other pension items, impairment charges, acquisition costs, discontinued operations and discrete tax item." Proxy at 46. However, the Proxy fails to provide the line item projections for the various adjusted items, and further fails to reconcile the adjustments by providing the most directly comparable financial measures calculated and presented in accordance with GAAP. The omission of such information renders the non-GAAP financial projections disclosed in the Proxy misleading.

### *The Conflicts Goldman Sachs Faced as a Result of its Preexisting Relationships With Joy and Komatsu*

54. The Proxy is also materially incomplete and misleading with respect to the conflicts of interest Goldman Sachs faced as a result of its preexisting relationships with both Joy and Komatsu.

55. With respect to Joy, the Proxy vaguely states that "Goldman Sachs has provided certain financial advisory and/or underwriting services to Joy Global and its affiliates from time to time for which the Investment Banking Division of Goldman Sachs has received, and may receive, compensation." Proxy at 44-45. This statement is misleading, as it fails to provide any material details necessary for Joy shareholders to properly assess whether Goldman Sachs' longstanding relationship with Joy constitutes a disabling conflict of interest, such as the specific services it has provided to Joy in the past two years and the amount of fees it has received for such services. Indeed, such information is explicitly required by SEC regulations, and is therefore material to shareholders. 17 C.F.R. § 229.1015(b)(4). Indeed, the relationships between investment banks and corporate management can run deep, and an investment bank often has business with the corporation and its management that spans more than one transaction.

Where an investment bank is providing a fairness opinion for long-standing clients, it may be influenced to find a transaction fair to avoid irritating management and other corporate actors who stand to benefit from the transaction, as this will ensure future lucrative business. The omission of this information also renders the Proxy's assertion that Goldman Sachs determined that the Merger Consideration is fair based solely upon the various assumptions and limitations described in its written opinion materially misleading, because shareholders cannot currently determine how the prior fees and past engagements Goldman Sachs has worked on for Joy influenced its Fairness Opinion.

56.     With respect to Komatsu, the Proxy vaguely states that "Goldman Sachs also has provided certain financial advisory and/or underwriting services to Komatsu and/or its affiliates from time to time." Proxy at 45. This statement is misleading, as it fails to provide any material details necessary for Joy shareholders to properly assess whether Goldman Sachs' longstanding relationship with Komatsu constitutes a disabling conflict of interest, such as the specific services it has provided to Komatsu in recent years and the amount of fees it has received for such services. Such information is material to Joy shareholders, as it is imperative for shareholders to be able to understand what factors might have influenced Goldman Sachs' analytical efforts.

### *Information Regarding the Events Preceding the Signing of the Merger Agreement*

57.     The Proxy also omits or misleadingly describes certain information regarding the events leading up to the signing of the Merger Agreement.

58.     First, the Proxy fails to disclose that Komatsu previously expressed interest in acquiring Joy, and/or that that members of Joy management or the Board had previously discussed a potential strategic combination with Komatsu before the first overture referenced in

18

the Proxy on January 25, 2016. Proxy at 25. Indeed, public sources indicate that Komatsu had previously expressed interest in acquiring Joy in 2012, but the Proxy is silent as to communications between Komatsu and Joy that occurred prior to January 2016. Such information is material to Joy shareholders, as it necessary for them to properly assess the extent of the relationship between the key players at Joy and Komatsu, and determine whether Komatsu was Joy management's and the Board's preferred suitor.

59. Second, the Proxy fails to provide any information about the *basis* upon which the Board inexplicably concluded that "Komatsu was the best buyer for Joy Global and that it was not likely that any other potential party would be willing and capable of acquiring Joy Global at a price equal to or great than Komatsu." Proxy at 29. Such information is clearly material to Joy shareholders, as they undoubtedly want to know the specific information that purportedly backs up the Board's decision not to solicit a *single* other party, particularly in light of the fact that industry observers have indicated that several other parties would have been interested and capable of acquiring Joy had the Board actually bothered to approach them.

60. Third, the Proxy at page 32 states that Komatsu's $28.00 offer represented a "premium over the *historic trading prices* of Joy Global common stock…" This statement is misleading because Komatsu's offer actually represented a 2% *discount* to Joy's 52-week intraday high market price of $28.99, and a significant discount to Joy's trading price prior to July of 2015. Defendants must therefore clarify that Komatsu's offer only provides a premium when compared to Joy's trading price in recent months.

61. Lastly, as noted above, in an effort to downplay the significance of the Company's second quarter results and persuade shareholders to support the deal, the Proxy suggests that the increase in Joy's stock price between early June and mid-July was the result of

an "unexplained increase" Proxy at 32. Joy's stock price increase during this period was not

"unexplained"; rather, as Fox Business noted in an article published on July 6, Joy shares

"jumped 24.1% in June after earnings results topped expectations."[4] The Proxy must therefore

clarify that Joy's stock price increased in June 2016 as a result of the fact that the Company beat

Wall Street estimates. The current summary of Joy's second quarter earnings release on page 28

of the Proxy is misleading, as it fails to provide this critical information.

62. Based on the foregoing disclosure deficiencies in the Proxy, Plaintiff seeks

injunctive and other equitable relief to prevent the irreparable injury that Joy shareholders will

suffer if they are required to vote on the Proposed Merger without the above-referenced material

misstatements and omissions being remedied.

### Defendants Knew or Were Negligent in Not Knowing That the Proxy Omits Material Information

63. The Individual Defendants knew or were negligent in not knowing that the Proxy

omits the material information concerning the Proposed Merger and contains the materially

incomplete and misleading information discussed above.

64. Specifically, the Individual Defendants undoubtedly reviewed the contents of the

Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required

to do so. The Individual Defendants thus knew or were negligent in not knowing that the Proxy

omits the material information referenced above and contains the incomplete and misleading

information referenced above.

---

[4] *Why Shares of Joy Global Inc. Popped 24% in June*, FOX BUSINESS (July 6, 2016), http://www.foxbusiness.com/markets/2016/07/06/why-shares-joy-global-inc-popped-24-in-june.print.html.

## CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Joy common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

66.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of July 18, 2016 there were over 98.1 million outstanding shares of Joy common stock. The holders of these shares are believed to be geographically dispersed throughout the United States;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

    i.    Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

    ii.    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii.    Whether Plaintiff and the other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Merger is consummated as presently anticipated.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     Defendants have filed the Proxy with the SEC with the intention of soliciting Joy shareholder support for the Proposed Merger.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

69.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Joy, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

70.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

71.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the Company's internal financial analyses and forecasts prepared by management, presented to the Board, and utilized by Goldman Sachs in connection with preparing its fairness opinion; (ii) conflicts of interest Goldman Sachs faced as a result of its prior work for both Joy and Komatsu; and (iii) certain information regarding the events preceding the signing of the Merger Agreement.

72.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can

Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Joy within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Joy and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Merger.  The Proxy at issue contains the

unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were, thus, directly involved in the making of the Proxy.

78. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

79. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

80. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

81. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

B.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Joy shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with the Joy shareholder vote on the Proposed Merger, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.    Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 26, 2016

**ADEMI & O'REILLY, LLP**
By: */s/ John D. Blythin*
Guri Ademi (SBN 1021729)
Shpetim Ademi (SBN 1026973)
John D. Blythin (SBN 1046105)
Mark A. Eldridge (SBN 1089944)
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
gademi@ademilaw.com

sademi@ademilaw.com
jblythin@ademilaw.com
meldridge@ademilaw.com


**OF COUNSEL**

Nadeem Faruqi
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel: 212-983-9330
 Fax: 212-983-9331

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Melissa Gordon ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against Joy Global Inc. ("Joy") and the other named defendants and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in Joy securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, unless otherwise specified below.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 26th day of August, 2016.

_Melissa Gordon_
Melissa Gordon

| Transaction<br>(Purchase or Sale) | Trade Date | Quantity/Price |
|---|---|---|
| Purchase | 11/16/15 | 100 shares @ $15.50 |
| | | |
| | | |
| | | |
| | | |
| | | |